Breece-White Manufacturing Company *v.* Green.

Opinion delivered October 18, 1926.

1. Master and servant—safe appliances—jury question.—Whether a master was negligent in not placing bumpers on a saw carriage to prevent breaking of a piston *held* for the jury.

2. Master and servant—assumed risk.—The breaking of a piston of a sawmill carriage *held* under the evidence to be an extraordinary risk and not one assumed by a servant.

3. Compromise and settlement—operation and effect.—Where a master and servant agreed that the master should pay the medical bills of an injured servant and full-time pay during incapacitation, and the servant agreed to accept such payment as settlement, such agreement bars the latter's action for damages.

4. Evidence—privileged communication.—A physician may not, over the patient's objection, testify as to information obtained by him while treating the patient.

5. Appeal and error—harmless error.—The exclusion of testimony tending to increase the amount of damages is harmless where no objection is raised to the amount of recovery.

Appeal from Desha Circuit Court; *T. G. Parham,* Judge; affirmed.

*E. E. Hopson,* for appellant.

*Sam M. Levine* and *Norman Moore,* for appellee.

WOOD, J. This action was instituted by Jim Green against the Breece-White Manufacturing Company. The plaintiff alleged that, while in the employ of the defendant company, on the 26th of March, 1923, he was injured through the negligence of the defendant in failing to exercise ordinary care to provide plaintiff a safe place to work; that the defendant was operating a saw-carriage propelled by steam, which forced a piston attached to the saw-carriage to operate along a horizontal plane; that the operation of the steam carriage and shotgun feed was in the exclusive charge of the company's sawyer; that the steam lines, the valves and other parts of the machinery had become defective and dangerous; that such defective and dangerous condition was unknown to the plaintiff, but the defendant knew, or should have known, of such condition; that, as the result of the negligence of the defendant company, the piston was forced from the gun of the carriage and propelled against the plaintiff, breaking and fracturing the bones of both limbs as well as inflicting serious wounds about his head; that the defendant was negligent in failing to furnish bumpers for the piston to keep it within bounds, and in the careless handling of the carriage lever. The plaintiff alleged that he had been damaged in the sum of $12,500, for which he prayed judgment.

The defendant, in its answer, denied specifically the allegations of the complaint as to negligence, and alleged that the injury to the plaintiff was the result of an accident, and that the injury was the result of ordinary risks and dangers incident to the work in which the plaintiff was engaged. The defendant also alleged that, prior to the institution of the action, the plaintiff and defendant had entered into an agreement by which the defendant was to pay all doctors' and medical bills and agreed to pay the plaintiff his wages for the full time that he was incapacitated. This agreement the defendant pleaded as a complete defense to the plaintiff's cause of action.

The defendant admitted that the plaintiff was in its employ at the time of the accident and injury, but denied that the injuries were as severe as alleged by plaintiff, and denied that it was liable in damages for such injuries.

The testimony adduced by the plaintiff tended to prove that, at the time of his injury, he was running a cut-off saw situated at the front end of the mill, about 70 or 80 feet from the carriage machinery. The accident occurred on March 26, 1923. The plaintiff was standing with his back toward the carriage. The thing went off, and that is all plaintiff knew. The plaintiff then described the nature of his injuries, which it is unnecessary to set forth, inasmuch as there is no controversy as to the amount of the verdict, if the defendant is liable for the injury.

One of the witnesses for the plaintiff described the occurrence as follows: "I was working on the cut-off saw at the time Jim Green was injured. The piston blew out. Three men were injured—two completely knocked out, and one dead; don't know how it got loose. I was the closest man to the injury. The piston came from out of the gun—came very rapidly—a wink of the eye, and it was all over. The rings were on the end of it. The piston seemed to be broken off. The part broken off seemed to be that part ordinarily exposed while the carriage is working. I have been working around sawmills all my life. There was no bumper or anything like that between Jim Green and the carriage. I have seen carriages at other mills and have seen bumpers and other obstructions to check the carriage if it got loose. I saw them at the Chicago mill, and at Bogalusa. The Bogalusa mill is the largest one I know anything about." On cross-examination the witness stated that he knew nothing about the building of a sawmill, but had seen lots of them. He had seen two sawmills that had obstructions, which witness thought were put there for something—he just saw that there was a bumper that looked as if it would stop a piston if it happened to come out. Witness

saw a piston come out of the gun at Bogalusa. It killed three men.

J. Z. Tucker testified that he was in the employ of the defendant as superintendent of manufacture. He had charge of the employees and of the operation of the mill, running of the machinery, and the manufacture of the stuff that goes out. He knew something about mill-wright work. He had been fifteen or eighteen years engaged in mill work in connection with repairs, construction and assembling of parts. Witness was talking to Jim Green at the time he was injured. Witness was injured at the same time. Witness' duties were to watch after the carriage and things and see if he could detect anything wrong. The safety of witness as well as the safety of the other men depended on witness' vigilance. Witness did not know that there was any unsafe condition or that anything was liable to happen to the machinery at the time of the accident. The piston broke and the follow-head was separated from the gun, causing the accident. If there had been any defect there, witness would have discovered it, but, so far as human knowledge and skill was concerned, the mill was, up to the time of the accident, in good condition. After the accident happened, witness saw the broken parts, and nothing has developed in examining these parts to show that witness could have foreseen the accident. There were no bumpers installed in the mill at the end of the piston. It was not necessary for the safety of the men working around the plant. Witness had known cases of bumpers doing more damage than good. The witness was charged with the duty of installing bumpers if it became necessary. A bumper has been installed since the accident, but witness did not do it. The carriage was under witness' charge. The accident happened by the piston coming out of the back end of the cylinder. They were operating at the time, and the brake was on center, and the valve was open to go ahead, and, when that thing broke in two, it left the head, and the remaining part of

the steam rushed in there with the full steam power behind it. The whole cylinder blew off.

The defendant's master mechanic testified, and qualified as a machinist and master mechanic. He stated that the saw-carriage runs backward and forward on the track. That that was what it was doing when the piston broke. Witness never had his attention called to any defective condition of the piston. The piston broke by reason of crystallization of the metal. The piston was purchased from Fohr & Stowell, a reliable machinery concern. The machinery in the plant was first-class. A piece of crystallized metal cannot be detected by looking at it. The defendant could not have known that the piston was defective before it broke. The reason witness knew that the piston was crystallized is that it was glassy and glittery when it was first broken. Witness looked at it about five minutes after it happened, and it was like glass china in spots all over it. If it had not been crystallized, it would not have broken off smooth.

C. L. White testified that he was the general manager of the defendant company. He was at the mill on the day when Jim Green was injured. He had just left the mill at the time of the accident. No notice or complaint of any kind had been served on witness as to the condition of any machinery, and especially of the piston. Witness had no information that the piston was defective. As soon as the accident occurred, witness called Drs. Barlow, Francis and MacCammon, and told them to look after Jim Green until he was discharged. Witness told Green that he was going to pay him for his time and doctors' bills and his medicine bill until he was able to go to work. This the defendant company did. Green came back to work about a year from the time of the accident. When defendant paid Green for his time and paid his doctors' bills, Green accepted it, and indicated to witness that he was satisfied when witness told him defendant would pay until he came back to work. The defendant company took one dollar a month from the pay of each man, provided they wanted to pay it that

way. Some of them did not want to pay it. It was optional on their part. If they pay it, it gives them free doctors' services whenever they need it. The company is not the beneficiary of the one dollar in any way, and, if a man objects to paying it, it is not taken out. It is not a fact that Green was paid without coming to an agreement with him. The defendant never stopped paying. It paid Green's time and doctors' bill and medicine bill until he came back to work. When he returned to work, he afterwards left on his own hook.

A witness who was operating the saw at the time of the injury testified that he was operating the steam feed as he had always done, and that there was no warning that there was anything wrong. The secretary and treasurer of the defendant company testified that the company paid the plaintiff from March 26, 1923, the date of the accident, to March 16, 1924, the sum of $593.60. After plaintiff came back to work the company paid him $13.50. The company paid for medicine and doctors' bills the sum of $553.10.

The defendant offered to prove by Dr. MacCammon that he was in the employ of the defendant company to treat those of the defendant's employees who wished to be on the doctors' list. He gave his attention to the employees, their families and dependents. He saw Jim Green immediately after the injury. He had concussion of the brain, which rendered him unconscious from the time of the accident until the next morning. During that time he suffered no pain. Plaintiff did not complain any more than the average patient. He saw the wounds exhibited to the jury, and would say that the bones are in good shape. The witness would consider the plaintiff a well man. The plaintiff objected to the introduction of the above testimony, and the court sustained the objection.

The plaintiff testified in rebuttal that he did not have a settlement with the defendant after the injury. He did receive money from the company for his time.

Over the objection of the appellant, the court gave the following instruction: "No. 2. If the plaintiff, Jim Green, was in the performance of his duty, in the employ of the defendant corporation, Breece-White Manufacturing Company, engaged at work in a place and under circumstances in no way connected with the instrumentality that caused the injury of which he complains, he having been struck by a portion of the flying machinery which was hurled against him through the pressure of steam, as the result of want of ordinary care on the part of the defendant corporation, its agents or servants, or through the failure of the defendant, its agents or servants, to discard or repair the said machinery or appliances, after a defective condition therein, if such existed, was known to the defendant company, its agents or servants, or should have been known to the defendant company, had ordinary care been exercised to detect such defective condition, or in the failure of the defendant company, its agents or servants, to use due care to provide the plaintiff with a reasonably safe place in which to work, then it is your duty to find for the plaintiff." To the ruling of the court the defendant duly excepted.

The defendant asked the court to instruct the jury that, under the law and the evidence, the plaintiff is not entitled to recover. The defendant also presented the following prayers for instruction:

"No. 15. You are instructed that the plaintiff, in accepting employment by the defendant company, assumed all of the risks and hazards incident to the operation of a sawmill.

"No 16. If you find from the evidence that the defendant company entered into an agreement with the plaintiff by the terms of which the defendant company should pay the doctors' bills and medicine bills and plaintiff's time from the time of the injury until he should be able to return to work, and if you find that the defendant, in good faith, carried out the conditions of the contract entered into, and that plaintiff accepted the medical treatment and payments and did return to work

for defendant company on the 16th day of March, 1924, then you will find for the defendant.''

The jury returned a verdict in favor of the appellee in the sum of $1,000. Judgment was entered in accordance with the verdict, from which judgment the defendant duly prosecutes this appeal.

1. The appellant contends that there was no evidence to sustain the verdict; that the undisputed evidence proved that the injury to appellee was the result of an accident; that the accident was caused by the breaking of the piston, and the breaking of the piston was caused from the crystallization of the metal thereof, which could not have been anticipated by the appellant company, and could not have been discovered and prevented by the exercise of ordinary care upon the part of the appellant. The appellant therefore urges that the court erred in giving appellee's prayer for instruction No. 2, submitting to the jury the issue of negligence, and also erred in refusing appellant's prayer No. 1 for a peremptory instruction.

We do not concur with learned counsel for appellant in this view of the testimony. It was an issue for the jury under the evidence as to whether the appellant was negligent in failing to exercise ordinary care to provide the appellee a safe place in which to work. It was for the jury to say whether the exercise of ordinary care upon the part of the appellant required the construction of bumpers or some other means of obstruction which might have protected the appellee from injury resulting from the breaking of the piston while in the performance of his duty. There was testimony for the appellee tending to prove that other large mills had built bumpers which gave their employees such protection, and appellant's own superintendent of manufacture, without any objection on the part of the appellant, testified that, after the injury, appellant also installed such a bumper, and that originally such a bumper was installed there. The jury had before it for inspection the part of the piston that broke.

We believe the testimony was sufficient to make it an issue for the jury as to whether or not the appellant was negligent in failing to exercise ordinary care to provide the appellee a safe place to work.  The jury might have concluded that, by the exercise of ordinary care on the part of the appellant to examine the machinery and appliances and the place where appellee was performing his duties, the appellant should have discovered that the installment of bumpers was necessary for the protection of the appellee, or that a proper inspection of machinery would have discovered some defect therein. The issue of negligence was correctly submitted to the jury by the court's instructions, and there was testimony sufficient to sustain the verdict on that issue.

2.  Counsel for appellant next contends that the undisputed testimony shows that the risks of the work in which appellee was engaged were obvious, and that the appellee assumed these risks.  But not so; even the testimony of appellant's own witnesses proves conclusively that the risk of injury from the breaking of a piston, under the circumstances, was not an ordinary risk to appellee's work, nor was it an obvious risk.  On the contrary, it was one of those extraordinary hazards which only the exercise of ordinary care upon the part of the master might have anticipated and prevented. It was not so open and obvious that the appellee, in the exercise of ordinary care for his own protection in the performance of his duties, could or should have known, and appreciated the danger incident to the operation of the carriage machinery.  No duty of inspection devolved upon appellee to discover the alleged defects in machinery and appliances which caused the injury.  The servant does not assume such risks.  See *Greenville Stone & Gravel Co.* v. *Chaney,* 129 Ark. 96, 195 S. W. 13; see also *Chess & Wynne Co.* v. *Wallis,* 134 Ark. 136, 203 S. W. 274; *Vaughan* v. *Hinkle,* 146 Ark. 149, 225 S. W. 226; *C. R. I. & P. Ry. Co.* v. *Daniel,* 169 Ark. 23, 273 S. W. 15.

The court correctly instructed the jury that the plaintiff, while in the employ of the defendant, agreed

to assume all the ordinary risks and dangers incident to the work in which he was engaged, but the court also correctly ruled in refusing appellant's prayer for instruction No. 5. That instruction was too broad, and did not properly declare the law of assumed risk applicable to the facts of this record.

3. The court did not err in refusing to give appellant's prayer for instruction No. 16. Such prayer was not an accurate statement of the law applicable to the facts on that branch of the case. The court correctly declared the law on this branch of the case in instruction No. 17, which is as follows:

"You are instructed that, if you find from the fair preponderance of the evidence that the plaintiff and defendant entered into an agreement, after the injury complained of, by the terms of which agreement the defendant agreed to pay plaintiff's doctors' and medicine bills and agreed to pay plaintiff full time during such time as he should be incapacitated and unable to work, and that the plaintiff accepted said terms of settlement in full settlement of any claims he might have, and returned to work for the defendant company, the payments made will be a bar to his recovery of any damages, and you will find for the defendant."

4. There was no error in the ruling of the court in excluding the testimony of Dr. MacCammon. This testimony was not competent because it was information obtained by the physician while treating his patient, and was therefore in the nature of a confidential communication. Furthermore, even if the testimony had been competent, it was not prejudicial error to exclude it, because it related only to the measure of appellee's damages. The appellant, in its motion for a new trial, did not assign as error that the verdict was excessive. Therefore the exclusion of Dr. MacCammon's testimony, in any view of the case, was not prejudicial to appellant.

We find no error in the rulings of the trial court, and its judgment is therefore affirmed.